**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

LATANGELA SENITA FANIEL,

Plaintiff,

v.

CAROLYN W. COLVIN,

Defendant.

**DECISION & ORDER**
14-CV-6340

## Preliminary Statement

Plaintiff Latangela Senita Faniel brings this action pursuant to Title XVI of the Social Security Act seeking review of the final decision of the Commissioner of Social Security ("the Commissioner") denying her application for supplemental security income. See Complaint (Docket # 1). Presently before the Court are the parties' competing motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. See Docket ## 11, 13.

## Background and Procedural History

On November 4, 2008 and October 28, 2009, plaintiff applied for supplemental security income. Administrative Record ("AR.") at 143–50. On November 30, 2008 and March 17, 2009, plaintiff received Notices of Disapproved Claims. AR. at 43–45, 49–52. Plaintiff timely filed a request for a hearing before an Administrative Law Judge ("ALJ"). AR. at 56. ALJ Brian Kane dismissed plaintiff's

request for a hearing on June 23, 2010 per plaintiff's request, and this dismissal was remanded by the Appeals Council with an Order to associate plaintiff's claim dated October 28, 2009 and to provide a hearing. AR. at 41–42. On December 20, 2012, a hearing was held before ALJ Brian Kane. AR. at 663–702. Plaintiff appeared at the hearing with her attorney, Justin Goldstein. Id. Dr. Peter Manzi, a Vocational Expert, also testified at the hearing. Id. On January 7, 2013, the ALJ issued a decision, therein determining that claimant was not disabled prior to November 15, 2011 under section 1614(a)(3)(A) of the Social Security Act. AR. at 21–30. However, the ALJ did find plaintiff to be disabled beginning November 15, 2011 because no jobs existed that plaintiff could perform based on her limitations. AR. at 29–30. On January 15, 2013, plaintiff timely filed a request for review of the ALJ's decision by the Appeals Council. AR. at 15. On April 21, 2014, the Appeals Council refused to review the ALJ's decision, making the ALJ's decision the final decision of the defendant Commissioner. AR. at 7–10. This federal lawsuit followed.

## Medical History

Because the ALJ found plaintiff to be disabled as of November 15, 2011, the Court focuses its review on plaintiff's disability status prior to November 15, 2011.

In 2005, plaintiff presented for swelling in her knee and periodic aching, and she was prescribed Motrin and Naproxen to treat the pain. AR. at 264, 266, 269. In November 2008, plaintiff was treated for chest pain. AR. at 452.

In 2006, plaintiff was referred to mental health services as part of her parole. AR. at 275. According to the record, plaintiff had been incarcerated for approximately five years and was sentenced to an additional five years of parole after she shot and killed her child's father. AR. at 276. At her mental health appointment, plaintiff reported anxiety and PTSD and trouble with sleep, as well as a history of depression. AR. at 276—77. Plaintiff also reported trauma from the abusive relationship with her victim. AR. at 279, 283. Upon examination, plaintiff appeared to be alert and oriented, cooperative, depressed, organized, and logical. AR. at 281. Plaintiff was prescribed Zoloft and Zyprexa, as she had positive results from those medications in the past. AR. at 283. Plaintiff's primary diagnosis was Posttraumatic Stress Disorder (PTSD). AR. at 284.

On June 22, 2007, plaintiff was treated for a crisis service and was diagnosed with depression NOS (not otherwise specified). AR. at 314. On July 27, 2007, plaintiff presented to Unity Health System for an Emergency Center Psychiatric Assessment. AR. at 320. Plaintiff reported suicidal intent, as she was experiencing more

3

flashbacks than usual. Id.

On October 7, 2008, LCSW Jay Pruiett treated plaintiff at the Evelyn Brandon Health Center for Mental Health. AR. at 287. He noted that plaintiff had made good progress in adjustment to society after being released from prison. Id. Plaintiff was noted to have made an "overall decision to depend upon society for financial support," and she "appear[ed] to have little motivation for work, and an investment in the idea that she cannot do so." Id. Just before this appointment, Mr. Pruiett had noted that plaintiff "does not seem interested in exploring possibilities for work which would circumvent" her anxiety problems. AR. at 313. Similarly, on August 12, 2009, Mr. Pruiett noted plaintiff's depressive disorder to be in remission, but he noted that she had "no active change goals" because she was "invested in the belief she is disabled and cannot work." AR. at 285. On November 10, 2009, plaintiff was again noted to "prefer[] to believe that she is disabled due to her preferred coping strategies of avoidance and denial," and she was "not motivated to work with her social anxiety." AR. at 293.

On January 26, 2009, plaintiff presented to Dr. Maryanne G. Hamilton for a Psychiatric Evaluation. AR. at 329. Plaintiff reported difficulty falling asleep, weight gain, depression, and suicidal ideation without a plan. AR. at 330. Plaintiff "reported anxiety only when she is around strange men or if she is grabbed."

4

Id.  Plaintiff also reported occasional panic attacked, "if people
put their hands on her or if she sees men she does not know."  Id.
Plaintiff was cooperative throughout the examination, although her
social skills and memory skills were impaired.  AR. at 331.
Plaintiff was "capable of following simple directions"; could
"perform simple tasks independently"; could maintain attention;
would be "mildly impaired in maintaining a difficulty schedule,
learning new tasks, or performing complex tasks independently";
would be "moderately impaired in making decisions, relating
adequately with others, or dealing well with stress appropriately";
and ultimately these symptoms may interfere with plaintiff's
"ability to function on a daily basis."  AR. at 332.  Plaintiff was
diagnosed with severe depression and PTSD.  AR. at 332.  Dr.
Hamilton found plaintiff's prognosis to be fair given the severity
of plaintiff's symptoms and recommended that she continue with
psychological and psychiatric treatment.  AR. at 333.  Although
vocational rehabilitation and training may not have been immediately
appropriate, Dr. Hamilton recommending considering those options
eventually.  Id.

On March 13, 2009, psychologist M. Morog reviewed plaintiff's
records and found plaintiff to be mildly impaired in activities of
daily living; moderately impaired in maintaining social functioning;
and mildly impaired in maintaining concentration, persistence, or

pace. AR. at 348.

Plaintiff presented on December 22, 2009 for a second Psychiatric Evaluation, this time with Dr. Adele Jones. AR. at 359. Plaintiff was again diagnosed with PTSD, as well as dissociative disorder NOS. AR. at 362. Dr. Jones recommended that plaintiff continue with her treatment as currently provided, and plaintiff's prognosis was fair. AR. at 363.

On January 19, 2010, psychologist E. Kamin reviewed plaintiff's records and found plaintiff to be mildly impaired in activities of daily living; mildly impaired in maintaining social functioning; and moderately impaired in maintaining concentration, persistence, or pace. AR. at 378. Plaintiff also appeared to have had one or two repeated episodes of deterioration, each of extended duration. Id.

On March 3, 2010, plaintiff began treatment with Dr. Martin B. Gingras. AR. at 614. Dr. Gingras noted that plaintiff had injured her knee twenty years earlier when she was struck by a motor vehicle. Id. Plaintiff's symptoms had decreased over time, but a year before the appointment, she had noticed recurrence of her pain, including swelling and popping of her knee. Id. Otherwise, plaintiff was in "excellent health, except for depression." Id. Upon examination and x-rays, plaintiff was prescribed Aleve and exercises and told to appear for a follow-up in three weeks. Id. At the follow-up visit, plaintiff stated that the Aleve and exercises did not help,

and she was in a moderate amount of pain, but she denied that her
pain woke her up at night, that her knee locked, or that it gave out
on her. AR. at 616. Dr. Gingras planned to perform arthroscopic
intervention to relieve plaintiff's knee pain. Id.

On April 13, 2010, plaintiff had surgery on her right knee at
Westfall Outpatient Surgery Center. AR. at 617. At her follow-up
appointment, plaintiff denied being in acute pain, was not taking
pain medication, and denied her right knee causing her trouble. AR.
at 618. On August 2, 2010, plaintiff still had some slight swelling
in her knee and some pain, but she also had problems with her hip
as a result of her altered gait. AR. at 619. On October 4, 2010,
plaintiff reported problems in her left knee, with her right side
"bothering her to some degree as well," and pain in her low back and
right hip. AR. at 620. However, examinations revealed no swelling
of plaintiff's knees, and her back and hip exams were unremarkable.
Id. X-rays were similarly unrevealing or unremarkable. Id.
Accordingly, Dr. Gingras prescribed continued use of indomethacin,
which plaintiff reported "has been helpful," and asked her to begin
a program of exercises. Id.

On May 25, 2010, Dr. Rory P. Houghtalen with LCSW Jay Pruiett
completed a Mental Impairment Questionnaire regarding plaintiff's
disability status. AR. at 418. They noted that plaintiff had "made
excellent progress with medications and therapy." Id. Plaintiff

7

showed "[n]o evidence of impairment," but the prognosis was "guarded due to absence of motivation for change." AR. at 419. Plaintiff had moderate difficulties in maintaining social functioning but was otherwise unlimited. AR. at 420. It was also noted that plaintiff experienced anxiety related to social interactions, and she preferred "avoidance to change," was "not motivated to work," and had thus "avoided any corrective interventions." AR. at 421. In a Mental Residual Functional Capacity form, plaintiff's treating mental health professionals indicated that plaintiff was not impaired in areas of understanding, memory, concentration, persistence, social interaction, or adaptation. AR. at 422—24. Mr. Pruiett ultimately concluded that "[t]here is no evidence of active psychiatric symptoms which would inherently preclude employment, or which there is not a viable corrective strategy." AR. at 425.

Plaintiff was treated by Mr. Pruiett on December 1, 2010, at which she reported being "laid up with her knee," which caused her to miss some appointments. AR. at 497. Plaintiff also expressed anger for Mr. Pruiett's "failure to endorse her as mentally disabled and for pushing her to do something different interpersonally." Id.

On January 24, 2011, plaintiff visited Dr. Gingras and reported that her knee felt "fairly good" but it was still swelling. AR. at 621. Plaintiff's MRI revealed a torn medial meniscus. Id. Since

8

plaintiff was "not having too much pain at this time," Dr. Gingras prescribed Indocin. Id. At a follow-up on July 29, 2011, plaintiff reported that a cortisone injection had helped her knee "quite a bit," and despite "still having some discomfort," it was "nothing that she cannot manage with indomethacin." AR. at 622. Plaintiff reported that the pain had subsided enough that she did not wish to have another cortisone injection. Id. On September 26, 2011, plaintiff reported that her right hip pain had "increased quite a bit," and she had difficulty lying on that side. AR. at 623. Plaintiff was tender upon examination and received a cortisone injection. Id.

On October 11, 2011, plaintiff reported that her right hip was continuing to bother her but was "much less painful than before her cortisone injection." AR. at 584. She continued to be "at least moderately tender to palpation," and she received another cortisone injection. Id. On the same day, Dr. Gingras completed a Physical Assessment for Determination of Employability form. AR. at 579. Dr. Gingras did note that plaintiff had right hip trochanteric bursitis and right knee pain, but he opined that plaintiff was "able to participate in activites (e.g. work, education and training) for up to 40 hours per week, does not have any limitations and does not require any treatment/rehabilitation." AR. at 579, 580—81.

On November 15, 2011, plaintiff again presented to Dr. Gingras, this time reporting "increased pain starting at the level of the low

9

back on the right side, and then extending to the lateral aspect of the right hip and all the way down into her right foot." AR. at 603. Plaintiff reported that the pain was "a lot worse than it was the last time she was evaluated." Id. Upon examination, plaintiff walked with a noticeable limp and experienced pain upon straight leg raising. Id. As a result, Dr. Gingras believed that plaintiff may have a ruptured disk at L4-5 on the right side, and he gave her a prescription for Noro and Voltaren for pain control, as well as prescribing an MRI. Id. A November 18, 2011 MRI of her lumbar spine revealed disc protrusion at L5-S1 and foraminal protrusion at L4-5. AR. at 600.

## Hearing Testimony

Testimony of Plaintiff: On December, 2012, a hearing was held before ALJ Brian Kane. AR. at 663—702. Plaintiff testified that she was forty-one years old at the time of the hearing and lived in an apartment with her three children. AR. at 668—69. Plaintiff stated that she had an eleventh grade education and had obtained a GED. AR. at 669. She also earned a home health aide certificate and certification to do medical billing and coding or work as a medical secretary. Id. Just before the hearing, plaintiff was attending Monroe Community College to study human services for twelve credit hours, four days per week. AR. at 670—71. Plaintiff

10

testified that her schooling was taking longer than expected because she could not take as many credits due to the walking and work involved. AR. at 671. In addition to her classes, plaintiff was doing field work placing homeless individuals in temporary housing. AR. at 672. Plaintiff had worked for a cleaning company in 2011 and had worked in a temporary job, as well as selling shoes in 2005 as part of her incarceration work release, and in 2001 she had worked full-time as a home health aide. AR. at 674—77.

Plaintiff testified that she experiences pain in her back which causes her "to have to adjust every now and then," has trouble going up stairs, and needs to take breaks due to her back pain. AR. at 673. She missed four to six days of school the previous semester and left early four days. AR. at 674. In 2006, plaintiff noticed swelling and pain in her knee, and Dr. Gingras found that plaintiff's "knee bones were going into [her] tissue." AR. at 681. Later, Dr. Zyman sent plaintiff for a myelograph due to her back pain. Id. Upon having knee surgery, plaintiff saw no improvement. AR. at 684. Plaintiff stated that she received cortisone injections in her knee and hip, but they did not help. AR. at 685. Plaintiff was scheduled to have disc replacement surgery shortly after the hearing. AR. at 686. Plaintiff testified that she had tried to cut back on her smoking but was still smoking three cigarettes per day. AR. at 687.

Plaintiff was also seeing a therapist for posttraumatic stress

11

disorder and was taking Zyprexa, Trazadone, and Zoloft, which helped her symptoms. AR. at 688—89. Plaintff had "up and down moments," and she would stay in her room when she had a down moment. AR. at 689. Plaintiff had trouble being around other people, specifically crowds or loud, aggressive people. AR. at 690. Plaintiff slept "three hours at most" per night, but the medication helped some. Id.

Plaintiff does housework, laundry, and grocery shopping, although her children often helped her shop. AR. at 691. She is unable to lift and carry the grocery bags, and she did not lift over five or ten pounds because it would cause back spasms. AR. at 691. While sitting, plaintiff quickly experienced pain in her tailbone. AR. at 692. Plaintiff also described her difficulty walking and going up and down stairs. AR. at 692—93.

Testimony of the Vocational Expert: Dr. Peter Manzi, a vocational expert ("VE"), also testified at the hearing. The VE classified plaintiff's past work as (1) a cleaner, light and unskilled, SVP of two, (2) cashier, light and unskilled but performed as medium, SVP of two, (3) sales person, light and semiskilled, SVP of four, (4) transporter of patients, medium and unskilled, SVP of two, as well as (5) a part-time position as a school bus monitor, light and unskilled, SVP of two. AR. at 695—96. For the first hypothetical, the ALJ asked the VE to assumed "an individual who is able to lift and carry 20 pounds, stand and walk up to six hours during

12

a work day, and sit for six hours," with "the attention and concentration necessary to perform at least three or four-step processes." AR. at 696. The VE testified that such an individual could perform plaintiff's past work as a school bus monitor, cashier, or cleaner. AR. at 696—97. The individual could also work as a collator operator, which is light and unskilled with an SVP of two, with 44,148 jobs available nationally and 205 available regionally. AR. at 697. The individual could also work as a laundry sorter, which is light and unskilled with an SVP of two, with 128,478 jobs available nationally and 378 available regionally. Id.

The ALJ then modified the hypothetical "to consider someone who is limited to lifting and carrying ten pounds," can "[s]tand or walk two hours and sit for six hours," but would also require "two breaks a day of half an hour, in addition to regular breaks." AR. at 697—98. The VE testified that this individual would not be able to perform any of plaintiff's past relevant work and there would be no other jobs available. AR. at 698. If the hypothetical was modified to require a total of an hour of additional breaks, jobs would not be available. Id.

For the third hypothetical, plaintiff's attorney removed the limitation for breaks but added "limitations of little to no contact with the public, only occasional interaction with coworkers, supervisors and would have essentially a sit/stand option where every

13

20 minutes they would have to switch positions from sitting and standing, with 20 minutes being the maximum amount of time that they could do either one," with "walking limited only essentially getting to and from the work station." AR. at 698—99. The VE testified that such an individual could not perform plaintiff's past work. AR. at 699. However, the individual could work as an addresser, which is sedentary and unskilled, with an SVP of two, or as a table worker, which is sedentary and unskilled with an SVP of two. AR. at 700. The VE further stated that the individual could likely be off task approximately ten percent of the time. Id.

For the fourth hypothetical, plaintiff's attorney asked the VE to assume "an additional limitation where there is difficulty with maintaining a schedule or difficulty maintain productivity level where essentially it would result in the hypothetical person being off task greater than 15 percent of the workday." Id. The VE responded that there would no work available for that person. Id.

### Determining Disability Under the Social Security Act

The Evaluation Process: The Social Security Act provides that a claimant will be deemed to be disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than

14

twelve months." 42 U.S.C. § 1382c(a)(3)(A). The impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 1382c(a)(3)(B).

The determination of disability entails a five-step sequential evaluation process:

> 1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.
>
> 2. If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.
>
> 3. If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocations factors such as age, education, and work experience.
>
> 4. If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.
>
> 5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps.

15

Shaw v. Chater, 221 F.3d 126, 132 (2d Cir. 2000); see also 20 C.F.R. §§ 404.1520, 416.920. Plaintiff bears the burden of proving her case at steps one through four. At step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do." Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (noting that Commissioner "need not provide additional evidence of the claimant's residual functional capacity" at step five); see also 20 C.F.R. § 404.1560(c)(2).

When evaluating the severity of mental impairment, the reviewing authority must also apply a "special technique" at the second and third steps of the five-step analysis. Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008); see also 20 C.F.R. § 404.1520a(a). First, the ALJ must determine whether plaintiff has a "medically determinable mental impairment." Kohler, 546 F.3d at 265—66; see also 20 C.F.R. § 404.1520a(b)(1). If plaintiff has such an impairment, the ALJ must "rate the degree of functional limitation resulting from the impairment(s)" in four broad functional areas: "(1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation." Kohler, 546 F.3d at 266; see also 20 C.F.R. § 404.1520a(c)(3). "[I]f the degree of limitation in each of the first three areas is rated 'mild' or better, and no episodes of

16

decompensation are identified, then the reviewing authority generally will conclude that the claimant's mental impairment is not 'severe' and will deny benefits." Kohler, 546 F.3d at 266; see also 20 C.F.R. § 404.1520a(d)(1). If plaintiff's mental impairment is considered severe, the ALJ "will first compare the relevant medical findings and the functional limitation ratings to the criteria of listed mental disorders in order to determine whether the impairment meets or is equivalent in severity to any listed mental disorder." Kohler, 546 F.3d at 266; see also 20 C.F.R. § 404.1520a(d)(2). If plaintiff's mental impairment meets any listed mental disorder, plaintiff "will be found to be disabled." Kohler, 546 F.3d at 266. If not, the ALJ will then make a finding as to plaintiff's residual functional capacity. Id.; see also 20 C.F.R. § 404.1520a(d)(3).

The ALJ's Decision: In applying the five-step sequential evaluation, the ALJ made the following determinations. At the first step, the ALJ found that plaintiff had not engaged in substantial gainful activity since January 1, 2002, the alleged onset date of her disability. AR. at 23. At the second step, the ALJ found that plaintiff has severe impairments of major depressive disorder, post traumatic stress disorder, and a herniated disc. Id. At the third step, the ALJ analyzed the medical evidence and found that plaintiff did not have a listed impairment which would have rendered her disabled. AR. at 23—24. The ALJ further found that plaintiff had

17

no restrictions in activities of daily living; no difficulties in social functioning; had moderate difficulties with regard to concentration, persistence, or pace; and had experienced no episodes of decompensation. AR. at 24.

Accordingly, the ALJ moved to the fourth step, which required asking whether plaintiff has the residual functional capacity ("RFC") to perform her past work, notwithstanding her severe impairments. The ALJ concluded that prior to November 15, 2011, plaintiff had the RFC to perform light work with the additional limitations that she could lift and/or carry twenty pounds, stand and/or walk for six hours in an eight-hour workday, sit for six hours in an eight-hour workday, and was able to maintain the attention and concentration necessary to perform three or four step processes. AR. at 24—27. The ALJ further concluded that beginning on November 15, 2011, plaintiff had the RFC to perform sedentary work with certain limitations. Based on the RFC, the ALJ determined that plaintiff could not perform her past relevant work. AR. at 28.

Because plaintiff was unable to perform her past work, the ALJ proceeded to the fifth step, which is comprised of two parts. First, the ALJ assessed plaintiff's job qualifications by considering her physical ability, age, education, and previous work experience. Id. The ALJ next determined whether jobs exist in the national economy that a person having plaintiff's qualifications and RFC could

18

perform. Id.; see also 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. §§ 404.1520(f), 416.920(f). The ALJ found that prior to November 15, 2011, "there are jobs that exist in significant numbers in the national economy" that plaintiff could perform, specifically working as a collator operator or laundry sorter pursuant to the VE's testimony. AR. at 29. However, the ALJ found that beginning of November 15, 2011, there were no jobs that existed that plaintiff could perform, and she was therefore determined to be disabled as of November 15, 2011 through the date of decision. AR. at 29—30.

## Standard of Review

The scope of this Court's review of the ALJ's decision denying benefits to plaintiff is limited. It is not the function of the Court to determine *de novo* whether plaintiff is disabled. Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 447 (2d Cir. 2012). Rather, so long as a review of the administrative record confirms that "there is substantial evidence supporting the Commissioner's decision," and "the Commissioner applied the correct legal standard," the Commissioner's determination should not be disturbed. Acierno v. Barnhart, 475 F.3d 77, 80—81 (2d Cir.), cert. denied, 551 U.S. 1132 (2007). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Brault, 683 F.3d at 447—48

(internal citation and quotation marks omitted). "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (internal quotation marks omitted).

This deferential standard of review does not mean, however, that the Court should simply "rubber stamp" the Commissioner's determination. "Even when a claimant is represented by counsel, it is the well-established rule in our circuit that the social security ALJ, unlike a judge in a trial, must on behalf of all claimants affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009); see also Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999) ("Because a hearing on disability benefits is a nonadversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record."). While not every factual conflict in the record need be explicitly reconciled by the ALJ, "crucial factors in any determination must be set forth with sufficient specificity to enable [the reviewing court] to decide whether the determination is supported by substantial evidence." Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984). "To determine whether the findings are supported by substantial evidence, the

reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983). Moreover, "[w]here there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

## Discussion

Plaintiff challenges the ALJ's decision primarily on the grounds that (1) the ALJ's RFC finding prior to November 15, 2011 is flawed because he failed to evaluate plaintiff's right knee dysfunction and impaired mental health, and (2) the ALJ failed to apply the appropriate legal standards in "arbitrarily assigning" November 15, 2011 as plaintiff's onset date of disability. See Plaintiff's Motion for Judgment on the Pleadings (Docket # 11).

Disability Onset Date: As to plaintiff's contention that the ALJ "arbitrarily" assigned the disability onset date of November 15, 2011, I find that the ALJ's determination of plaintiff's onset date is based on evidence in the record. November 15, 2011 is the date

on which plaintiff's treating physician, Dr. Gingras, suspected that plaintiff had a ruptured disc, due to plaintiff's complaint that the pain was "a lot worse than last time she was evaluated." AR. at 603. Plaintiff relies on SSR 83-20 in support of her argument that she was in fact disabled as of November 28, 2009, and she contends that she had to have ruptured her discs before 2011, as she had complained of pain for many months before that. See Plaintiff's Motion for Judgment on the Pleadings (Docket # 11) at 17, 19—20.

SSR 83-20 states that in cases of disability with nontraumatic origin, the Commissioner should consider plaintiff's allegations, work history, and medical and other evidence concerning impairment severity in order to determine the disability onset date. See SSR 83-20, 1983 WL 31249, at *2 (Jan. 1, 1983). Here, plaintiff essentially contends that the ALJ should have discounted the objective medical evidence, specifically the reports from her treating physician Dr. Gingras, in favor of contacting a "medical advisor to assist in determining the onset date." See Plaintiff's Motion for Judgment on the Pleadings (Docket # 11) at 18. I cannot agree. SSR 83-20 specifically states that "[t]he medical evidence serves as the primary element in the onset determination." Plaintiff's treating physician noted on numerous occasions, based on plaintiff's own statements, that plaintiff's pain was not significant and was managed by medication and cortisone shots. Just

a few weeks before November 15, 2011, Dr. Gingras completed a form stating that plaintiff was able to work forty hours without limitations in spite of her medical issues. Plaintiff's argument relies on multiple cases in which there was a lack of medical evidence, and the Commissioner thus had a duty to develop the record before making a disability determination. See McCall v. Astrue, No. 05 Civ.2042(GEL), 2008 WL 53778121, at *16 (S.D.N.Y. Dec. 23, 2008) ("medical evidence in the record is sparse" and ALJ "relied on the date of [plaintiff's] SSI application"); Felicie v. Astrue, No. 95 Civ. 2832(LAP), 1998 WL 171460, at *3 (S.D.N.Y. Apr. 13, 2008) ("impairment seems to have occurred prior to the date of the first recorded medical examination"). SSR 83-20 contemplates that "it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling." SSR 83-20, at *2. In this case, there is medical evidence in the record supporting an onset date of November 15, 2011, and the ALJ properly relied on that evidence from plaintiff's treating physician's reports. See Donlon v. Astrue, No. 10-CV-6577, 2011 WL 3047749, at *7 (W.D.N.Y. July 25, 2011) (ALJ was not required to consult medical advisor where "he could make reasonable inferences about the progression of Plaintiff's physical impairment based on the medical evidence already contained in the file"). Accordingly, I find the ALJ's determination of the alleged disability onset date to be based on substantial evidence

23

in the record, and I find no error in his determination.

RFC Determination: Plaintiff also contends that the ALJ's RFC finding that she "could perform a limited range of light work with no limitations in interacting with others is not supported by substantial evidence." See Plaintiff's Motion for Judgment on the Pleadings (Docket # 11) at 20. Regarding her exertional limitations, plaintiff contends that this case should be remanded to include knee pain as a severe impairment at step two. Id. at 21. It is true, as plaintiff contends, that she complained of knee pain over the course of her treatment. However, plaintiff's treating physician, Dr. Gingras, specifically stated in his October 12, 2011 evaluation that plaintiff's knee pain (chondromalacia patella) caused her no limitations in an eight-hour work day. AR. at 582. Further, after plaintiff had surgery on her knee in 2010, she denied being in acute pain, denied that her knee was causing her trouble, and was not taking pain medication for her knee. AR. at 618. A physical examination in October 2010 revealed no swelling in plaintiff's knees. AR. at 620. In July 2011, plaintiff reported to Dr. Gingras that she was having some discomfort in her knee, but it was "nothing that she cannot manage with indomethacin," and she declined the option to receive a cortisone injection because the pain had subsided enough. AR. at 622. Thus, I find the ALJ's conclusion in line with Dr. Gingras's October 12, 2011 report indicating no

24

limitations as a result of plaintiff's knee pain to be appropriate.

Next, in support of her argument that the ALJ improperly evaluated multiple mental health opinions of record, plaintiff asks this Court to find that the ALJ improperly relied on the findings of her treating mental health sources, and that he should have instead relied on the results from a one-time examination with Dr. Jones and the review of a state agency psychologist, E. Kamin, who never examined plaintiff in person. See Plaintiff's Motion for Judgment on the Pleadings (Docket # 11) at 23. In his decision, the ALJ gave "great weight" to the opinion of Mr. Pruiett based on his treating relationship with plaintiff, despite his status as a licensed counselor, which is not an accepted medical source. AR. at 27. In so doing, the ALJ discussed the opinions of Dr. Jones and E. Kamin, who consultatively examined plaintiff and reviewed plaintiff's records, respectively. AR. at 26—27. Plaintiff argues that "[f]ailure to identify the weight given to medical opinions of record is an error." See Plaintiff's Motion for Judgment on the Pleadings (Docket # 11) at 24. The ALJ's decision does in fact state the weight given to these opinions, so this Court cannot agree with plaintiff's statement. Plaintiff also contends that it is "plain error" that the ALJ did not consider the opinions of Dr. Hamilton, a single-instance examining physician, and M. Morog, a state agency psychologist who did not personally examine plaintiff. See

25

Plaintiff's Motion for Judgment on the Pleadings (Docket # 11) at 23. However, this Circuit has stated that an ALJ "is not required to discuss all the evidence submitted, and his failure to cite specific evidence does not indicate it was not considered." Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 79 (N.D.N.Y. 2005) (citation and quotations omitted); see also Brault, 683 F.3d at 448 ("[a]n ALJ does not have to state on the record every reason justifying a decision," nor is an ALJ "required to discuss every piece of evidence submitted") (internal quotations and citation omitted). Further, these opinions would not change the ALJ's RFC finding. The ALJ gave Mr. Pruiett's opinion great weight based on his treating relationship with plaintiff, and Mr. Pruiett's Mental Residual Functional Capacity form specifically indicated that plaintiff was not impaired in areas of understanding, memory, concentration, persistence, social interaction, or adaptation. AR. at 422—24. On multiple occasions, Mr. Pruiett noted plaintiff's lack of desire to work, specifically stating that "[t]here is no evidence of active psychiatric symptoms which would inherently preclude employment, or which there is not a viable corrective strategy." AR. at 425. Thus, the ALJ's RFC determination was based on substantial evidence in the record, and I find no error with regard to the ALJ's consideration of these opinions.

## Conclusion

For the reasons discussed above, this Court finds that the ALJ's decision was supported by substantial evidence in the record. Therefore, plaintiff's Motion for Judgment on the Pleadings (Docket # 11) is **denied**, and the Commissioner's Motion for Judgment on the Pleadings (Docket # 13) is **granted**. Plaintiff's complaint is hereby dismissed.

JONATHAN W. FELDMAN
United States Magistrate Judge

Dated:     September 24, 2015
           Rochester, New York

27